Osborne & Baylor U v. Hon. Joe N. Johnson
















IN THE
TENTH COURT OF APPEALS
 

No. 10-97-231-CV

     HAROLD W. OSBORNE 
     AND BAYLOR UNIVERSITY,
                                                                                              Relators
     v.

     HONORABLE JOE N. JOHNSON, 
     JUDGE, 170TH DISTRICT COURT,
     McLENNAN COUNTY, TEXAS,
                                                                                              Respondent
 

 Original Proceeding
                                                                                                                

O P I N I O N
                                                                                                                

      Relators Harold W. Osborne and Baylor University bring this action seeking a writ of
mandamus against Respondent, the Honorable Joe N. Johnson, Judge of the 170th Judicial District
Court of McLennan County. This action stems from a discovery request served upon Osborne by
real parties in interest John and Naomi Fox. Osborne and Baylor filed written objections to the
request asserting among other things that some of the documents sought are protected by the
attorney-client privilege. After conducting a hearing and an in camera review of the documents
alleged to be privileged, Respondent ordered Osborne and Baylor to produce the documents for
discovery. Osborne and Baylor bring this original proceeding seeking mandamus relief from
Respondent’s order.
I. FACTUAL BACKGROUND
      John Fox was a professor of anthropology at Baylor. Each summer Fox directed a group of
Baylor students and other participants at a field school in Guatemala. After the 1996 field school,
several students registered complaints against Fox with Baylor officials concerning incidents which
occurred at the field school.
      Judy Parker was the primary complainant. Parker alleged among other things that Fox
engaged in inappropriate behavior and made inappropriate remarks which carried sexual overtones
during the field school. The Foxes filed suit against Parker for libel, slander, tortious interference
with John Fox’s employment contract, and loss of consortium.
      A number of Baylor administrators and other Baylor employees conducted an investigation
of the allegations made by Parker and the others. The investigators included, among others,
Baylor Provost and Vice-President for Academic Affairs Donald Schmeltekopf, Dean of the
College of Arts and Sciences Wallace Daniel, Osborne, who serves as the chair of Fox’s
department, General Counsel Basil Thomson, and Assistant General Counsel Charles
Beckenhauer. Each of the investigators participated to varying degrees in the investigation. 
Apparently not every member of the investigative group was present at each witness interview or
during each discussion of the allegations.
      The Foxes served Osborne with a subpoena duces tecum requiring him to appear for a
deposition and also requiring him to produce among other items:
●All notes, memorandae [sic], and minutes of meetings of committee investigating Dr.
John Fox, together with notes and reports by the committee containing
recommendations, to include all draft copies of such notes and reports;
      ●    All notes, minutes or documentation of committee meetings relative to the
investigation of Dr. John Fox; and
 
      ●    Copies of all committee reports on file relating to the investigation of Dr. John
Fox, to include copies of all letters, notes and minutes of meetings with and
from Baylor personnel in connection with the investigation.

      Osborne and Baylor filed written objections to the subpoena asserting among other things that
the documents sought are privileged from discovery by the attorney-client privilege.


 See Tex.
R. Civ. Evid. 503. Although Baylor itself was not subpoenaed, it objected on the basis that
Osborne engaged in these activities as a representative of the university and in consultation with
counsel for the university. Id. 503(a)(2).
      The parties appeared before Respondent for a hearing on the objections. Osborne and Baylor
presented the testimony of Beckenhauer, who testified in pertinent part that during the
investigation Osborne acted as a representative of Baylor and sought legal advice from
Beckenhauer and other Baylor counsel in connection with the investigation. They also tendered
an affidavit signed by Osborne together with the documents (under seal) which they seek to shield
from discovery. After considering the testimony, the affidavit, the argument of counsel, and the
documents themselves, Respondent overruled Osborne’s and Baylor’s objections and ordered them
to produce the documents.
II. THE STANDARD OF REVIEW
      In order to establish their entitlement to mandamus relief, Osborne and Baylor must establish
that the court committed a clear abuse of discretion and that they have no adequate legal remedy. 
Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). When a trial court
erroneously orders the production of documents protected by the attorney-client privilege, the
aggrieved party has no adequate remedy at law. Marathon Oil Co. v. Moyé, 893 S.W.2d 585, 589
(Tex. App.—Dallas 1994, orig. proceeding); see also West v. Solito, 563 S.W.2d 240, 244 (Tex.
1978) (orig. proceeding). Thus, the central issue we must determine in this proceeding is whether
Respondent clearly abused his discretion in ordering disclosure of the documents in question.
      When the court’s interpretation of a privilege against discovery is at issue, we review the
court’s decision as a legal conclusion. Moyé, 893 S.W.2d at 589; Keene Corp. v. Caldwell, 840
S.W.2d 715, 718 (Tex. App.—Houston [14th Dist.] 1992, orig. proceeding). We give limited
deference to such a conclusion. Walker, 827 S.W.2d at 840. “The trial court has no discretion
to determine the law or to apply the law to the facts incorrectly. A clear failure by the trial court
to analyze or apply the law correctly is an abuse of discretion.” Moyé, 893 S.W.2d at 589
(citations omitted); accord Caldwell, 840 S.W.2d at 718.
      However, if the evidence presented suggests the privilege may not apply because the
communication was not intended to be confidential or because the privilege was waived, a fact
issue exists for the trial court to resolve. Cameron County v. Hinojosa, 760 S.W.2d 742, 745
(Tex. App.—Corpus Christi 1988, orig. proceeding). If the parties present conflicting evidence
on the applicability of the privilege, the trial court’s decision “must be deemed conclusive.” Id.;
Gulf Oil Corp. v. Fuller, 695 S.W.2d 769, 773 (Tex. App.—El Paso 1985, orig. proceeding); see
also West, 563 S.W.2d at 245.
III. THE ATTORNEY-CLIENT PRIVILEGE
      Rule 503 of the Rules of Civil Evidence protects from discovery confidential communications
between an attorney or the attorney’s representative and a client or the client’s representative
which are “made for the purpose of facilitating the rendition of professional legal services to the
client . . . .” Tex. R. Civ. Evid. 503(b). In this case, we must determine whether the
documents which Osborne and Baylor claim to be privileged by this rule constitute
communications between “representatives” of Baylor and Baylor’s counsel and whether the
communications were “confidential.”
A. The Control Group Test
      By the promulgation of Rule 503(a)(2), Texas adopted the control group test for determining
whether an individual qualifies as the representative of a corporation or other entity which has
retained counsel. See National Tank Co. v. Brotherton, 851 S.W.2d 193, 198 (Tex. 1993) (orig.
proceeding). This test finds its origin in City of Philadelphia v. Westinghouse Elec. Corp. 210
F. Supp. 483 (E.D. Penn. 1962). In Westinghouse, the court held that a person qualifies as a
representative of a corporation for purposes of the attorney-client privilege if the person is “in a
position to control or even to take a substantial part in a decision about any action which the
corporation may take upon the advice of the attorney . . . .” Id., 210 F. Supp. at 485
(quoted by National Tank, 851 S.W.2d at 197).
      Thus, the Court determined in National Tank that a person qualifies as a representative of a
corporation or other entity for purposes of Rule 503 if the person “is one having authority to
obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the
client.” National Tank, 851 S.W.2d at 197 (quoting Tex. R. Civ. Evid. 503(a)(2)). However,
the Court may have caused some confusion later in its opinion when it stated, “[U]nder Rule
503(a)(2), the qualifying employees must be those actually having authority to hire counsel and
to act on counsel’s advice . . . .” Id., 851 S.W.2d at 199 (emphasis added). This statement
appears to conflict with the plain language of the rule which states the test disjunctively.
      We believe this isolated sentence was an inadvertent statement by the Court. In the next
paragraph, the Court observed that National Tank offered no evidence to prove that a particular
manager’s position in the corporation “vested [him] with authority to obtain professional legal
services, or to act on advice rendered pursuant thereto, on behalf of [National Tank].” Id., 851
S.W.2d at 200 (emphasis added). Thus, we conclude that in order to qualify as a representative
of an entity under Rule 503, a person must be shown to either have the authority to obtain
professional legal services on behalf of the organization or to act on advice rendered pursuant to
a request made under such authority. Later opinions confirm this conclusion. See Ford Motor
Co. v. Leggat, 904 S.W.2d 643, 646 (Tex. 1995) (orig. proceeding); El Centrio del Barrio, Inc.
v. Barlow, 894 S.W.2d 775, 778 (Tex. App.—San Antonio 1994, orig. proceeding); accord 1
Steven Goode et al., Texas Practice: Guide to the Texas Rules of Evidence: Civil and
Criminal § 503.3, at 339 n.51 (2d ed. 1993); but see Pittsburgh Corning Corp. v. Caldwell, 861
S.W.2d 423, 425 (Tex. App.—Houston [14th Dist.] 1993, orig. proceeding) (citing control group
test conjunctively).
      An entity can “fairly easily” establish whether an employee qualifies as a representative by
affidavit. See Cigna Corp. v. Spears, 838 S.W.2d 561, 566 (Tex. App.—San Antonio 1992, orig.
proceeding). “Generally, only someone relatively high on the corporate ladder will qualify.” 
Goode § 503.3, at 335-36. “Communications with underlings who may make internal
recommendations to their superiors but who are not themselves authorized to make the final
decision will remain unprivileged.” Id. at 341.
B. Confidentiality
      The attorney-client privilege only protects confidential communications. Tex. R. Civ. Evid.
503(b).
A communication is “confidential” if not intended to be disclosed to third persons
other than those to whom disclosure is made in furtherance of the rendition of
professional legal services to the client or those reasonably necessary for the transmission
of the communication.

Id. 503(a)(5).
  The issue of confidentiality focuses on the intent of the parties at the time the communications
are made. Goode § 503.5, at 347. Communications made in the presence of others who do not
qualify as representatives of the client or the lawyer are not considered confidential. Id. at 348
n.13 (citing Tex. R. Civ. Evid. 503(b)); see also Hinojosa, 760 S.W.2d. at 746.
C. The Burden of Proof
      An organization seeking protection from discovery of documents which it contends are
protected by the attorney-client privilege bears the burden to produce evidence by affidavit or
testimony demonstrating the applicability of the privilege. Tex. R. Civ. P. 166b(4); Giffin v.
Smith, 688 S.W.2d 112, 114 (Tex. 1985) (orig. proceeding).
      Once a prima facie showing of privilege is made, the party seeking discovery must tender
evidence to refute the asserted privilege. See Moyé, 893 S.W.2d at 591. If the party introduces
evidence which counters the claim of privilege, the trial court must conduct an in camera review
of the documents to determine whether the asserted privilege applies. Id. at 590. Often the
documents themselves will be the only evidence which substantiates (or refutes) the claimed
privilege. See Weisel Enter., Inc. v. Curry, 718 S.W.2d 56, 58 (Tex. 1986) (orig. proceeding);
Moyé, 893 S.W.2d at 590.
      If in camera review is required, the party in possession of the documents must tender them
to the court. Id. In doing so, the party must demonstrate the applicability of the privilege to the
documents in question. See Giffin, 688 S.W.2d at 114. The documents must be segregated from
other discoverable items. See Peeples v. Fourth Court of Appeals, 701 S.W.2d 635, 637 (Tex.
1985) (orig. proceeding). We believe the better practice is that employed by Marathon Oil in
Moyé where the company submitted a detailed log which identified each document and the
privileges asserted thereto. See Moyé, 893 S.W.2d at 591. Each document was separately
numbered and identified in the log. Id. at 591, 593 nn.1-2.
      “As a reviewing court, we may conduct our own in camera inspection to determine whether
a trial court properly applied the law of privilege to the documents.” Id. at 593 (citing Barnes v.
Whittington, 751 S.W.2d 493, 495 (Tex. 1988) (orig. proceeding)).
IV. THE EVIDENCE
A. The Tender of Osborne’s Affidavit
      As a preliminary matter, the Foxes argue that Osborne and Baylor failed to introduce
Osborne’s affidavit in evidence, and thus, it may not be considered by this Court. Rule 166b(4)
requires that the affidavit be served on opposing counsel at least seven days before the hearing in
order to be admitted as evidence.


 Tex. R. Civ. P. 166b(4). At the beginning of the hearing,
counsel informed the court that it would tender Osborne’s affidavit with the documents in question
for the court’s in camera consideration. Counsel stated, “I do not tender either the affidavit or the
attached documents in evidence, Your Honor, at least for general use, but I would submit them
to the Court for the Court’s consideration only and for in camera inspection of the enclosed
documents for which we seek protection.” At the conclusion of the hearing, counsel tendered the
affidavit with the documents stating, “You don’t have to take [the affidavit], Judge, but I’m
tendering it.”
      The Foxes did not object to the tender of Osborne’s affidavit. In fact, they attempted to
tender his deposition testimony in the same manner. Their counsel stated, “I will provide the
Judge with an unsigned copy of [Osborne’s] deposition for his consideration . . . .”


 The
court stated in its order that it “considered [among other things] the affidavit and deposition
testimony of Harold W. Osborne . . . .”
      A similar tender has been approved by the Fourteenth Court of Appeals. GAF Corp. v.
Caldwell, 839 S.W.2d 149, 150-51 (Tex. App.—Houston [14th Dist.] 1992, orig. proceeding). 
In GAF, the party resisting the discovery of certain documents tendered the documents in issue to
the court for in camera review with two affidavits attached. Id. at 150. The court concluded that
the affidavits constituted prima facie evidence that the documents were protected by the attorney-client privilege. Id. at 151. Apparently the trial court did not hold a formal hearing on the matter
but rather ordered the documents to be delivered for in camera review upon the filing of the
objections to the discovery request. Id. at 149-50.
      Although it is true that the party seeking discovery in GAF apparently did not contest the
propriety of the manner in which the affidavits were submitted, the court stated unequivocally that
the affidavits “presented sufficient evidence to support [the claimed privilege] . . . .” Id.
at 151; accord Shell Western E & P, Inc. v. Oliver, 751 S.W.2d 195, 196 (Tex. App.—Dallas
1988, orig. proceeding) (By attaching affidavits to motion for protective order, “Shell . . . 
produced evidence that the attorney-client privilege that it had asserted applied.”). The Dallas
court also stated, “An affidavit suffices to produce evidence concerning the applicability of a
certain privilege.” Id.
      One decision by our Supreme Court appears to contradict these cases. In Barnes, the party
objecting to discovery submitted affidavits inside sealed envelopes which also contained the
documents the party sought to protect. Barnes, 751 S.W.2d at 495. The Court stated, “These
affidavits should not have been considered by the trial judge as evidence in support of the privilege
because they were never filed with the district clerk; they contain no certificate of service; and,
they were not served on opposing counsel.” Id. The Court observed in a footnote, “Because [the
party] failed to properly serve the affidavits, the sworn statements constitute improper ex parte
communications.” Id. n.1. We consider Barnes distinguishable because Osborne served the
Foxes with a copy of his affidavit in compliance with rule 166b(4).
      From these cases we conclude that in a hearing in which a party seeks protection from a
discovery order, the party can satisfy the evidentiary requirements of rule 166b(4) by tendering
an affidavit to the court without formally offering it in evidence, if the affidavit has been timely
served on opposing counsel in accordance with the rule.


 Thus, we will consider Osborne’s
affidavit in deciding the merits of this case.
B. The Testimony
      In addition to the affidavit and the documents in issue, Osborne and Baylor presented the
testimony of Assistant General Counsel Beckenhauer. Beckenhauer testified that he participated
in the investigation of the complaints against Fox. He explained that three Baylor administrators
participated in a supervisory capacity: Schmeltekopf, Daniel, and Osborne, and he described the
respective positions of these officials in the chain of command. Fox reported to Osborne; Osborne
reported to Daniel; and Daniel reported to Schmeltekopf. According to Beckenhauer, Osborne,
Daniel, and Schmeltekopf each had “an inherent authority to deal with the potential disciplinary
matter.” He explained that each could take some disciplinary action on his own other than
termination. Although none possessed the authority to terminate Fox, any of the three could
“initiate the dismissal process.”
      Beckenhauer testified that Osborne, Daniel, and Schmeltekopf each had the authority to seek
out legal counsel in the matter involving Fox and to act on the advice of counsel in the matter. 
He explained that the three of them prepared various drafts of summaries of the investigation; that
he guided them in the preparation of the drafts; that he gave them legal advice in connection with
the preparation of the drafts; and that in doing so, he was acting as counsel for Baylor and for
Baylor’s representatives involved in the investigation.
      According to Beckenhauer, the investigators had to sift through many facts and make
appropriate disciplinary recommendations. Again he advised and counseled Osborne, Daniel, and
Schmeltekopf at their request in connection with the compilation of drafts and summaries of
findings, proposals and recommendations in connection with the investigation. Beckenhauer
testified that the documents tendered under seal include and reflect his advice and counsel and
consist of communications between the Baylor General Counsel’s office and the investigators and
between the investigators themselves.
      Beckenhauer concluded by asserting the attorney-client privilege on behalf of Baylor and by
testifying that he considers the documents confidential and that the documents were not intended
to be disclosed to anyone lacking decision-making authority.
      On cross-examination, Beckenhauer explained that he acted as both investigator and counsel
in the course of the investigation. He testified that the investigators interviewed students and took
written statements from them. General Counsel Thomson and he advised and counseled the
investigators on the reliability and trustworthiness of the evidence and in making the
“administrative decision” with respect to appropriate sanctions. He did not recall that any of the
documents tendered under seal contained any notes explicitly referencing his legal advice, but he
does believe that the documents contain “[c]onceptual ideas [attributable to him] in terms of fact-finding and discipline and what the appropriate response may or may not be.” He believed that
a part of his role as counsel in this matter included helping the investigators to evaluate whether
their fact findings were reasonable.
      Beckenhauer agreed that ultimate decision making authority in the Baylor hierarchy rests with
the university’s president. After January 1997, Beckenhauer was no longer “intimately involved”
with the investigation.
      Counsel for the Foxes read selected portions of Osborne’s deposition testimony into the
record. In the deposition, Osborne testified that the extent of his decision making authority was
to confer with Daniel. He identified Baylor Dean for Student Life Martha Lou Scott as another
participant in the investigation. He stated that he never received a copy of Parker’s written
complaint or any other written complaint. Osborne testified that Baylor Senior Counsel Bill
Underwood and Becky Singer interviewed him.



C. The Content of Osborne’s Affidavit
      Osborne explains in his affidavit that Schmeltekopf, Daniel, and he each have decision-making
authority for Baylor “including but not limited to the authority to initiate termination proceedings,
to obtain legal counsel, and to act on the advice of legal counsel.” He states that the three of them
“prepared rough drafts and discussion drafts of summaries of the allegations, . . . of reports
of the investigation of such allegations, along with rough drafts of preliminary findings, proposals,
and recommendations . . . .” He explains that they prepared these documents with the
advice of counsel and forwarded the documents to counsel “for review and comment.” Counsel
returned the documents to them “with direction, guidance, and legal advice regarding [them].” 
The documents “include, incorporate, and reflect the guidance, direction, and legal advice” given
by counsel. Osborne concludes that the documents “were made for the purpose of facilitating the
rendition of legal services to Baylor University, and to us as representatives of Baylor[;] . . 
. were intended to be confidential and are confidential[;] . . . were not intended to be
disclosed to third persons[;] and have not been disclosed to third persons other than those to whom
disclosure is made in furtherance of the rendition of legal services to the client, or to those
reasonably necessary for the transmission of the communications.”
V. THE DOCUMENTS IN QUESTION
      The documents in issue came to this court stapled together in an envelope. Various
documents within the packet are individually stapled as well. The documents can be generally
categorized as: (1) various drafts of a report on the investigation of the allegations against Fox and
a proposed cover letter for the report; (2) various drafts of a summary of the allegations; (3)
various drafts of proposed sanctions and notations related to appropriate sanctions; (4) office
correspondence between Beckenhauer and others concerning an issue tangentially related to the
investigation of the allegations; and (5) various handwritten notes apparently made by Osborne
relating to the investigation.
VI. APPLICATION OF THE LAW TO THE FACTS
A. Osborne’s Status
      The Foxes argue that in order for Osborne to qualify as Baylor’s representative he must have
ultimate decision-making authority. Professor Goode tends to support this position when he states
that under National Tank, an organization’s control group consists of only those “authorized to
make the final decision.” Goode § 503.3, at 341. However, we do not read the rule so narrowly.
      A person qualifies as a representative of an entity such as Baylor if he has the authority to hire
counsel on behalf of Baylor or has the authority to act on advice rendered by counsel pursuant to
an authorized request. Tex. R. Civ. Evid. 503(a)(2); National Tank, 851 S.W.2d at 197. As the
Court stated in National Tank, the rule extends not only to those “in a position to control” an
entity’s decision, but also to those “in a position . . . to take a substantial part in [the]
decision . . . .” National Tank, 851 S.W.2d at 197.
      Beckenhauer’s testimony and Osborne’s affidavit both assert that Osborne, Daniel, and
Schmeltekopf each possessed the authority to obtain legal counsel on behalf of the university and
to act on counsel’s advice. The evidence presented shows that Osborne at least played a
substantial role in the investigation of the allegations and in the recommendation of the appropriate
sanctions to be imposed.
      The only evidence the Foxes offered to counter this is Osborne’s statements that his authority
is limited to conferring with Daniel and that he never received a copy of any of the written
complaints filed against Fox. This evidence is not sufficient to rebut Osborne’s and Baylor’s
prima facie showing that Osborne was a member of the Baylor control group.
B. Confidentiality
      Beckenhauer’s testimony and Osborne’s affidavit both explained that the investigators
prepared the various drafts of their investigative reports and recommended sanctions in
consultation with counsel. The testimony and affidavit both assert that the documents tendered
under seal incorporate and reflect counsel’s advice. The testimony and affidavit also claim that
the communications contained in the documents were made for the purpose of facilitation of legal
services to Baylor and were intended to be confidential.
      From this evidence, Osborne and Baylor made a prima facie showing that the documents
tendered under seal are protected by the attorney-client privilege. However, other evidence raised
fact questions on the issues of whether the documents were intended to be confidential or whether
their confidentiality was waived by subsequent disclosure.
      Osborne testified in his deposition that at least one other person was involved in the
investigation, the dean of student life. This evidence presented the court with fact questions it had
to resolve in order to determine whether the documents in question were kept confidential by
Baylor as other Baylor employees were involved in the investigation besides Baylor’s counsel and
the three “primary” investigators.
      Under this state of facts, the documents themselves must be examined to resolve these
questions. See Weisel Enter., 718 S.W.2d at 58; Moyé, 893 S.W.2d at 590.
(1) The Investigation Report Drafts
      These drafts contain a summary of the procedures employed in the investigation; a summary
of the allegations; the findings of the investigators; recommended sanctions; and justifications for
the proposed sanctions.
      The drafts state that interviews of witnesses were conducted “by one or more of the following
individuals:” Schmeltekopf, Daniel, Osborne, “Dean for Student Life Martha Lou Scott (the
person to whom the allegations concerning the Field School In Guatemala were originally made),”
Thomson, Beckenhauer, “Director of Internal Audit Juan Alejandro and Assistant Director of
Internal Audit Karen Wash.”
      Neither Osborne nor Baylor offered any evidence that Scott, Alejandro, and Wash are
representatives of the university under Rule 503(a)(2). We cannot presume from their respective
titles that they are members of Baylor’s control group and thus authorized to seek or act on legal
advice. See El Centro, 894 S.W.2d at 779; Cigna Corp., 838 S.W.2d at 565-66; see also National
Tank, 851 S.W.2d at 200.
      Thus, the investigative reports themselves suggest that their contents were disclosed to some
extent to other Baylor employees who have not been shown to be within the control group. This
constitutes “some evidence either that the communications were never intended to be confidential,
or that the privilege was waived by disclosure to third parties . . . .” Hinojosa, 760 S.W.2d
at 746.
If anything in the documents themselves raises a question as to whether the privilege
applies, we can no longer presume the documents to be privileged, but the existence of
the privilege becomes a question of fact for the trial court, based on the documents and
the circumstances under which the communications were made.”

Id. When the evidence raises a fact question with respect to whether a document was not intended
to be confidential or whether the privilege was waived by subsequent disclosure, the trial court’s
decision is conclusive. Id. at 745; Gulf Oil, 695 S.W.2d at 773.
      Therefore, because a fact issue exists regarding whether the investigative report summaries
were intended to be confidential or whether their confidentiality was waived by subsequent
disclosure, the trial court’s conclusion that these documents are not protected by the attorney-client
privilege is conclusive. Hinojosa, 760 S.W.2d at 746.
(2) The Summaries of the Allegations
      These documents contain recitations of the allegations against Fox and the evidence which the
investigators received tending to support or disprove the allegations. According to the summaries:
“[t]he allegations are listed in order of the perceived strength of the evidence supporting
them. Individual allegations within categories are similarly ranked. Judgment of relative
strength of evidence is based on the number of persons making the allegation, whether
the allegation appears in a sworn statement, and the perceived quality of the testimony
of the person or persons making or corroborating the allegation.”

      Beckenhauer testified that Thomson and he counseled the investigators on the reliability of the
evidence presented. He suggested that the investigators’ conclusions about the reasonableness of
their findings were based at least in part on their counsel.
      Assuming for the sake of argument that such counsel falls within the ambit of “professional
legal services,” however, the allegations are incorporated into the investigative report summaries
we have previously addressed. We have already determined that a fact issue exists regarding
whether the investigative report summaries were intended to be confidential or whether their
confidentiality was waived by subsequent disclosure. Because the allegations are incorporated into
the investigative report summaries, a fact issue exists regarding whether the allegation summaries
were intended to be confidential or whether their confidentiality was waived by subsequent
disclosure. Therefore, the trial court’s conclusion that these documents are not protected by the
attorney-client privilege is conclusive. Id.
(3) The Proposed Sanctions
      The drafts of the proposed sanctions are literally that. They contain various proposed
sanctions with commentary.
      We have already determined that a fact issue exists regarding whether the investigative report
summaries were intended to be confidential or whether their confidentiality was waived by
subsequent disclosure. Because the proposed sanctions are incorporated into the investigative
report summaries, a fact issue exists regarding whether the proposed sanctions were intended to
be confidential or whether their confidentiality was waived by subsequent disclosure. Therefore,
the trial court’s conclusion that these documents are not protected by the attorney-client privilege
is conclusive. Id.
(4) The Office Correspondence
      These documents appear to be inter-office correspondence discussing an immigration matter. 
In the first memorandum, Beckenhauer presented the options available to Osborne, Daniel, and
Schmeltekopf regarding this matter. Four months later, Beckenhauer sent a similar note. 
Schmeltekopf then replied to Beckenhauer’s note.
      Beckenhauer sent carbon copies of his original note to three other individuals whose status
with Baylor is not shown by the record. Schmeltekopf sent carbon copies of his reply to these
three individuals and General Counsel Thomson.
      Neither Osborne nor Baylor offered any evidence that the individuals who received copies of
this correspondence are representatives of the university under Rule 503(a)(2). We cannot
presume that they are representatives of Baylor. See El Centro, 894 S.W.2d at 779; Cigna Corp.,
838 S.W.2d at 565-66; see also National Tank, 851 S.W.2d at 200.
      Thus, the correspondence suggests on its face that it was disclosed to some extent to others
who have not been shown to be representatives of Baylor. This constitutes “some evidence either
that the communications were never intended to be confidential, or that the privilege was waived
by disclosure to third parties . . . .” Hinojosa, 760 S.W.2d at 746.
      Therefore, because a fact issue exists regarding whether the correspondence was intended to
be confidential or whether its confidentiality was waived by subsequent disclosure, the trial court’s
conclusion that these documents are not protected by the attorney-client privilege is conclusive. 
Id. at 746.
(5) The Handwritten Notes
      The content of the handwritten notes suggest that they were written by Osborne.


 They
include among other things comments on appropriate sanctions to be assessed, comments on the
witnesses’ statements, and questions raised by the witnesses’ statements. The notes are not
separately identified in any fashion to suggest who was present when Osborne made them or when
he made them. They include comments made by others identified as Ben, John,


 Bill, and Becky.


 
They also reflect counsel from Senior Counsel Bill Underwood. 
      Generally, if a document contains information that is discoverable together with information
protected by the attorney-client privilege, the entirety of the document is protected by the
privilege. See Pittsburgh Corning, 861 S.W.2d at 425; see also Keene Corp., 840 S.W.2d at 719-20.
      However, the handwritten notes do not constitute a single document. They are a series of
documents, and the content of these documents show that each was prepared at different times
during the investigation. Moreover, Beckenhauer testified that the investigators discussed with
Thomson and he the reliability and credibility of the witnesses whom they had interviewed. By
submitting the notes together to the court without providing further evidence concerning when they
were prepared, who was present or participated in the discussions which led to their preparation,
or the status and identity of the persons whose comments are reflected in the notes, a fact issue
exists regarding whether the notes were intended to be confidential or whether their confidentiality
was waived by subsequent disclosure. Thus, the trial court’s conclusion that these documents are
not protected by the attorney-client privilege is conclusive. Hinojosa, 760 S.W.2d at 746.
VII. CONCLUSION
      The evidence presented raises a fact issue concerning whether the documents tendered under
seal were intended to be confidential or whether their confidentiality was waived by subsequent
disclosure. The trial court’s resolution of this fact issue is conclusive. Therefore, we conclude
that Respondent did not abuse his discretion in ordering production of the documents. We deny
Osborne’s and Baylor’s petition for mandamus relief.
 
                                                                               REX D. DAVIS
                                                                               Chief Justice


Before Chief Justice Davis
            Justice Cummings and
            Chief Justice McDonald (Retired)
Petition denied
Opinion delivered and filed October 10, 1997
Publish